Good morning, Your Honors. Good morning. I'm Michael Barthelemy, here for Appellants Jensen and Johnson Families with my co-counsel, Jeffrey R. Romero. Good morning. We are allotted 15 minutes in this matter for this oral argument, and we've allotted 15 of those minutes to Amicus Navajo Nation. And we reserve three minutes for rebuttal, if we may. We have 15 total. Fifteen total, and of that, we've allocated five of those minutes to Navajo Nation. Oh, you said 15. Disposed. Sorry. I'd like to do that, but he's allocated five minutes only, and so we'll reserve three minutes for rebuttal. All right. May it please the Court. The district court erred in misreading the case of Straight v. A1. Excuse me. A1 Contractors is requiring an automatic realignment of the roadway in question with non-Indian fee land for nonmember governance purposes. While purportedly relying upon Straight in its decision, the district court disregarded the broader jurisdictional analysis required by Straight by its reference, its quotation of National Farmers Union. And that is that determining a tribal court's jurisdiction over nonmembers requires a careful examination of tribal sovereignty and a detailed study of relevant statutes, treaties, and judicial decisions. And it's just this careful examination and detailed study that the district court failed to make. In Straight, the Supreme Court observed that Montana described a general rule with three other major qualifiers. Absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation subject to two exceptions. The district court first ignored the impliedly reserved treaty rights of the Navajo Nation and the stringent standard established by the Supreme Court for determining a congressional abrogation of treaty rights. The matter of abrogating treaty rights is reserved as an exclusive to the exclusive  Kagan. But we don't get into abrogating the treaty rights unless the treaty rights were otherwise preserved. Can we can you explain exactly how you think the treaty right to exclude was preserved through all of the transfers of this right-of-way? I'm particularly concerned about the last one from the BIA to the State. Where in the agreement giving that right-of-way was there a right to exclude that Well, Your Honor, the intergovernmental agreements themselves, well, let me detail the entire history of the transaction related to the treaty rights. First of all, the treaty was enacted in 1868 and reserved to the Navajo people the exclusive right and occupation of their traditional homeland. Second, the statute by which Congress funded construction of this roadway stated as its primary purpose to further the purposes of existing treaties with Navajo Indians. Third, the Supreme Court in its case Warren Trading Post in 1965 noted that this very right-of-way was subject to all obligations. And in the intergovernmental agreements, among them the agreement by Assanee to accept what had formerly been vested in the BIA as a right-of-way, they took that formerly vested right-of-way, they took assignment of that right-of-way subject to all obligations, conditions, and stipulations of said right-of-way. Now, if we look at the case of McDonald v. Means decided by this Court, we find there that the BIA right-of-way is subject to not only treaty obligations, as the Supreme Court noted, but it's subject to the fiduciary duties of the Secretary of Interior to the Indian tribe. So I actually wonder if you might have been able to claim that the BIA violated its fiduciary duties by not expressly maintaining that the tribe continued to have a right to exclude. That's a claim that I don't understand you to be making, though, and what we have here is a transfer of the BIA to the State that doesn't say anything about the tribe still being able to exclude anyone from this highway that's a Federal highway. Your Honor, in direct answer to your question, the treaty rights do not have to be expressly reserved. The reserved rights doctrine, a longstanding principle articulated by the Supreme Court, states that treaty rights are not a grant of powers from the to the tribe. They're a grant of rights from the tribe to the Federal Government, and in a reservation of all rights not expressly granted to the Federal Government. So it's not necessary under the reserved rights doctrine that the nation or the Secretary of Interior expressly reserve those rights. They are a general right to exercise authority over lands reserved for them. So then that sounds like you're saying Strait was wrongly decided, though. I mean, why wouldn't that have been true in Strait as well? Well, Your Honor, Strait was not a case in which the Petitioners or United States referred to any statute or treaty in support of its claim for tribal jurisdiction. It relied exclusively on concepts of common law concepts of inherent tribal sovereignty. So there was no treaty argument made in Strait. There was no statute to which the Petitioners or United States referred to in support of their argument that the tribe retained jurisdiction over a traffic accident occurring on a U.S. highway. Our case is a completely different case. And I might note, Your Honor, that when I quoted Strait and its reference to National Farmers Union, Strait said that determining a tribal court's jurisdiction requires a detailed study of relevant statutes, treaties, and judicial decisions. And the district court only concluded summarily that this roadway had to be aligned with non-Indian fee land without any consideration of the treaty argument or our argument that the treaty rights which are reserved without an expression of that reservation, they're already reserved within the treaty document itself, that it never considered that Congress had never affirmatively abrogated the treaty. Quite the contrary. Congress had in the funding legislation for construction of this roadway, had stated that its purpose in doing so was to further the purposes of existing treaties. So if you have a Federal highway, if there was a bus going through the Federal highway and not going off the highway, so just driving through the highway, your argument is that the tribe had the right to exclude that bus, and how would it do that even on a Federal highway that's just going through the reservation? Your Honor, the appellants do not argue that the tribe has the power to detain or exclude a bus or any vehicle merely passing through. The terms of the limited right-of-way provided that it would be free passage and that the roadway would be maintained by the State of Arizona and that it would be open to the public. But that does not address the issue of whether the tribe retained to itself the power, the inherent sovereign power to regulate commercial activities conducted by nonmembers within its reservation boundaries, a completely different issue. Okay. But so let's – it sounds like you are saying that the highway itself gave up the right to exclude, though. So if we think that's true – I mean, I think you just said that the tribe can't stop people from driving on the highway. If that's true, then why wasn't the district court right that the highway was not what the permit was talking about when it talked about where there was jurisdiction? The district court ruled that the tribe had in general a power to regulate commercial terrain on its reservation, but not on this particular highway. It sounds like you disagreed with that, though. No, we do not agree with that, Your Honor, because the first – I'm not clear on what your position is. You do not agree with the district courts? We agree with the district courts' ruling that the tribe had a general right to regulate commercial terrain on its reservation. Yes, we agree with that. But we do not agree with the district court's ultimate ruling that it had no jurisdiction over a traffic accident that occurred while commercial touring was taking place. It's our contention that the tribe has the power to regulate commercial activity by non-members coming to the reservation for the purpose of touring, visiting, and sightseeing the reservation on lands set apart for the use and occupation of Navajo Indians under its treaty. And that that power to regulate, that power to exclude, and its lesser included power to regulate commercial touring extends to commercial touring activities that are occurring on that roadway. But you said that there is no right to exclude from that roadway. There's no right to – excuse me, Your Honor – there's no right to exclude anyone merely passing through. The Navajo Nation realized that in granting the right-of-way that it was allowing free passage for the public. But it does have the right to detain, check for conformity to its Touring Guide Service Act, and to exclude anyone who's there for the express purpose of touring, visiting, and sightseeing the Nation. But only once they leave the highway? Pardon me? Only once they leave the highway? No, whether they're on the highway or on a tribal road or any other trust land. If they're on that right-of-way or on – I might know – But how would you know? I mean, I thought you just said that you don't have the right to stop people who are just passing through. So if you can't stop people who are passing through, how would you ever know whether they're on the highway because they're about to leave the highway or whether they're on the highway because they're passing through? Well, I might – I might clarify that. The tribe has the right to stop persons who are – they have a cross-deputization agreement with the State of Arizona. They can cross – they can stop anyone and detain anyone on the highway who appears to be violating State law. But they can't criminally prosecute nonmembers on that roadway. But they can stop and detain buses that – to check for conformity with the terms of the Tour and Guide Service Act. Because those buses are – those are tour buses, and they're there for the purpose of touring the Nation. Now, it can't be determined whether they're merely passing through or whether they are as the express charter companies did. They first visited the Navajo Tribal Park at Monument Valley on tribal trust land. They traversed Navajo Indian Route 42, which is a tribal trust property. They stayed overnight at the Hampton Inn, which is located by – on tribal trust land before the collision ever occurred. And so the tribe's regulatory power over that commercial activity was triggered by that activity and extended to the highway. Think of – How do we know that? Do we know that because of the language of the permit? We know that because the inherent powers of the tribe and its powers to exclude and its powers to regulate under its treaty provide that those rights are reserved. With respect to the inherent powers to regulate and to exclude, I might point to Marion v. Hickory Apache Tribe. In that case, the Supreme Court – in that case, the Hickory Apache Tribe had allowed oil and gas companies to enter for the purposes of exploring for and developing oil and gas. And the question was whether they could tax – they could regulate by taxation those activities, whether the tribe could – and the Supreme Court in that case ruled that the tribe, once it allowed them to enter on condition, did not relinquish its sovereign power to ultimately oust them for nonconformity with the initial conditions of their entry. In this case as well, the tribe – On tribal land, though, right? Yes, on tribal lands. Now, in this case, there's a question, of course, as to whether or not this roadway is to be construed as or treated as the equivalent of non-Indian fee land for nonmember governance purposes, or whether it remains – it retains its character as tribal trust land. And what's your position on that? It's our position that the roadway retains its tribal trust land character. But even if this Court were to find that the roadway is to be treated as the equivalent of non-Indian fee land for nonmember governance purposes, still the two Montana exceptions are there to determine whether the tribe retains inherent tribal sovereignty to regulate that activity on this roadway where a consensual relationship is formed between the nonmember conducting commercial activity or where that conduct directly affects or threatens the political integrity, economic security, and health and welfare of the tribe. So the two Montana exceptions are available, and the Court is directed to review whether the inherent sovereignty of the tribe to regulate this commercial activity on that roadway is preserved, retained, under one or the other of those two exceptions. In 2004, how did touring companies find out what the language of this permit was? And how did they know that they even needed to get this permit? I might note, Your Honor, that in the very agreement between Go Ahead Vacations and the bus company, Express Charters, there was an agreement by which the bus company had agreed that it would conform to all local laws and secure all local licenses necessary to conduct its operations. It was, the duty was incumbent upon the bus company to determine that conducting these commercial touring activities on the nation required an application for securing a permit, paying a permit fee, signing a written acknowledgment of tribal court jurisdiction, providing proof of insurance, conforming to all the safety regulations that were enacted and passed in the Touring Guides Service Act. And they did none of that. They instead took, they exploited the tribal resource that is available there. They came to view the landscape and the culture of the people. And they did so for pecuniary advantage without conforming to the terms of the regulation passed by the Navajo Nation. All right. Thank you, counsel. You've used all the time, but we will give Amicus three minutes to. Thank you. Address the Court, and we'll give you a minute for rebuttal. Thank you. Thank you. Good morning, Your Honors. My name is Paul Spruan. I'm Assistant Attorney General at the Navajo Nation Department of Justice. Could you put three minutes on the clock, ma'am? Pardon me. This is the Amicus. Thank you. And as Judge Rollinson has mentioned, we are Amicus. We are a sovereign Indian nation who comes before you with a government-to-government relationship with the United States through the Treaty of 1868. Given the time that I have, I'd like to focus a little bit on the tort claim at issue here as a regulation, as part, a form of the comprehensive regulation of the nation to the conduct of the appellees in this situation. Once they entered the reservation for the specific purpose of commercial touring, they were subject to the comprehensive regulation of their tour guide services, particularly in this case where they entered Monument Valley Park, indisputably untribal trust land. If we found that there was no adjudicatory jurisdiction over this accident on this highway, that wouldn't necessarily mean that you couldn't do all your other regulation of tourism, would it? True, but we think that that stymies the comprehensive nature of dealing with these tour guide services if we do not have this tort jurisdiction. We see it as part and parcel of this comprehensive way of dealing with things. On the front end, you have the licensing. But why is that? I mean, do you think there would be a different result in the tribal court as opposed to State or Federal court? I believe that's correct, Your Honor. What would be different about the result? The substantive law is quite different, as discussed in the briefs, in terms of what is a compensable tort, in terms of who has the standing to bring such an action in this case where you have a fatality. And we believe that it's part and parcel of our general sovereignty to have the ability on the front end and the back end to deal with activities such as the appellees conducted in this situation. And so from our perspective, not having the ability to regulate through this tort claim, but only having some front end licensing if they feel like complying, which here they evaded any attempt to comply. They didn't enter into the agreement, which would have been consent to tribal jurisdiction. And so not having the opportunity to do so. But would that have been consent to tribal jurisdiction for all purposes or only for the purposes of administering the tour operator agreement? We believe the agreement itself, and the Federal District Court made a lot about this agreement and the specific language in the agreement. And the language says that the touring company, assuming they complied, consent to, quote, the jurisdiction of the Navajo Nation courts relating to the activities under this agreement on lands within the jurisdiction of the Navajo Nation. We believe in this situation the tort claim falls within this consent if they had complied. It is part of the activities to have a negligent action on this road, and therefore the agreement, had they signed onto it, this would have been clearly within the scope  Kagan, couldn't someone have read this permit, though, and thought that if they had an accident on land that was clearly still tribal off this highway where there was no right-of-way, that there, there would be a jurisdiction, but not on this highway where there's this, it's a Federal highway with a right-of-way? They could have had that belief. They could have clarified with the Nation as to what the scope of the language was. What would the procedure for clarifying have been? I think talk to the licensing agency within the tribe and say we see that there's this language in the agreement. What does this mean? As our highest court resolved, they said clearly, clearly it means all lands within the territorial jurisdiction of the Navajo Nation. At the time, if they had concerns, I see my time is up. Your Honor. Okay. Thank you. I think at the time, had they had concerns about the scope of the agreement, they could have inquired. They did not. They simply evaded. Could I ask you the question about how someone would have known in 2004 that they needed this permit? It seems that this company didn't get the permit, so somehow there was a, I don't know, if you were enforcing this requirement or not, how would someone even have known that they needed this? Well, given the Nation's resources, it's sort of an honor system. There's published code book where the Tour Guide Services Act would have been available. Knowing they were entering the Nation, presumably through their legal counsel, they could have said are there requirements? And they would have found this Tour Guide Services Act in the code, and so wait a minute, we have to get a license. And then they would have inquired, I believe at the time it was the Economic Development Office, now it's Parks and Rec, to inquire what are the requirements. Since they went to Monument Valley, they clearly knew they were entering the Navajo Nation. Any responsible carrier would have inquired as to the jurisdictional requirements. All right. Thank you, counsel. Thank you. We'll hear from opposing counsel. Good morning, Your Honors. Eileen Gilbride for the plaintiffs in this case. I think we have a pretty straightforward analysis. The Tribe has no inherent sovereignty over non-Indians, and the Tribe has no treaty-based sovereignty rights over alienated lands within the reservation. Both those precepts apply here. You have a non-Indian plaintiffs, the would-be defendants in tribal court, and we have an accident that occurred on alienated land. Those facts bring into play two things. First, the presumption that the exercise of tribal jurisdiction is invalid. And second, the defendant's burden to overcome that presumption by showing that there are treaty-based rights or one of the Montana exceptions applies. There are no treaty-based rights here for two reasons just mentioned. The tribal inherent sovereign rights apply to members, not to non-members. And that's from Montana itself. Montana said that the Tribe's inherent sovereign rights under the treaty at issue in that case, which is similar to our treaty here, only extends to the land on which the Tribe can exercise absolute and undisturbed use and occupation. Straight then held, of course, that the state right-of-way is the same as alienated land for the jurisdictional purposes. Those treaty rights, said the court, have to be read in light of the land's subsequent alienation. That's what we have here. As Your Honor noted, there's no language in any of the right-of-way documents, the tribal council resolution, the appropriation legislation, or anything else that gives the Navajos the absolute and undisturbed use, the right to absolute and undisturbed use and occupation of the roadway, or to allow them to exclude folks from driving on the roadway. So any treaty rights that might have existed before the right-of-way no longer exist. Defendant... What recourse is available for the injured parties in this case, that family Navajo? They can bring their case in state or federal court. So they do have their right, their remedies. It's just not in tribal court. Too late now? Is it too late now for them to bring such an action since they started in the tribal court and... I believe there's equitable estoppel that stops the statute of limitations from running while they're litigating in a different forum. Would your client stipulate to that? I don't know. Honestly, I had not gone that far, Your Honor. I'm just here on this particular matter. But I had thought about that question, and I think they still have the right to bring in state court, but I'm not certain what the dates are. Is there a reason why your client is more concerned about being in tribal court versus a different court? I'm sure they feel like they would get a better shake in state or federal court, but the law is the law. Yeah. So if the law is the law, why are you fighting being in tribal court? Because the law is the law means we need to be in state or federal court. The point I was just leaving was that defendant's position that U.S. 60 is Indian land is just not supported by any current case authority. What's your response to opposing counsel's reliance on the Montana exceptions? To amicus? I think it was amicus. He's not on your side, so he's opposing counsel. Yes. Yes. Yes, Your Honor. Well, neither of the exceptions applies. This is certainly not a we're right along the lines with straight. This is not a consensual relationship. The accident that occurred here really has nothing to do with a permit. It has nothing to do with Turing regulations. It's just an accident. So opposing counsel's amicus, if you will, says that if the two operator had complied and entered into the agreement as it was supposed to do to operate, then there would have been a consensual relationship. What's your response? I don't agree with that because I think the district court agreed that there is a relationship whether they actually sign the permit or obtain the permit or not. The problem here is that the accident, there's no nexus between the accident and the permit relationship, and that was the same problem in straight. In straight, they assumed there was a consensual relationship. If the permit consented to jurisdiction, I'm not sure we need a nexus. So to me, the question is, does this permit actually represent consent, even assuming it's signed, which it sounds like maybe you're not contesting that we could sort of assume it was signed and go from there. I know it wasn't signed, but if we assume that it should have been signed and ask whether it even would have represented consent if it had been signed, what is your argument that the language of the permit doesn't represent consent anyway? Well, I think there's an important difference between assuming that the permit had been signed for a purpose of did a consensual relationship exist and a contractual agreement if the permit had been actually signed. So in other words, we're talking about the legal issue of did a consensual relationship exist, and we're going to assume the existence of a permit for that, because you can't not get a permit and say, well, we didn't agree to it, because you can't do that. So the legal issue is, was there a consensual relationship? We can assume the existence of a permit. But then doesn't the permit tell us what that relationship was? The permit itself says we agree to Navajo jurisdiction over activities that occur within the jurisdiction of the Navajos. So if the permit had been actually signed, would that mean that the tool operator had agreed to be subject to the jurisdiction of the tribal court? For this accident. For this accident. On tribal land. No. Why not? Because the permit language says lands within the jurisdiction of the Navajo. But Amica's counsel has told us that the tribal court says that that means the highway running through the reservation. So you would be bound by that interpretation, wouldn't you? I don't think so. Because, again, we have the difference between what parties would have agreed to had we signed the permit or, you know, introduced it. We were going on a hypothetical that it was signed. So if it were in fact signed, and if the tribal court had determined that the signature meant that tribal lands were all lands running through, including the would be bound to the jurisdiction of the tribal court. For this accident. For this accident. No. Because, again, I'm trying to make the distinction between a meeting of the minds contractually where the tribal court doesn't say what the meeting of the minds was and, on one hand, and on the other hand, the legal consensual relationship analysis that we have in Strait, Montana, et cetera. We're not dealing with an actual meeting of the minds situation. But if we assume it was signed, then we have to kind of assume that we are, right? But we don't go. If you were going to assume in a hypothetical that there was an actual agreement between the parties, then you go between what the two parties intended. But that happens all the time, that parties sign contracts, and then they dispute what the language of the contract is, and some neutral arbiter tells them what the meaning of the contract is. You don't get to say, I'm not, we have, our minds haven't met because we disagree on the meaning of a contract. Right. Right. But that's after litigation of the factual issue. There wasn't a factual issue here. It's a legal issue. So. So. Should we construe this contract against the drafter?  Against the Navajos? That would be if you had a factual issue. If you had a factual issue of meeting of the minds, that would be one of the, you know, rules of construction that you would have to use. But we don't have a factual meeting of the minds issue here. It's not a contractual issue. It's a subject matter jurisdiction issue of the legal effect of a consensual relationship, which is the Turing relationship, and whether or not this highway accident, this negligent happenstance that occurred by non-Indians on a U.S. federal highway, whether there's a nexus between that and the Navajos' right to require permits for touring on Navajo land. What do we do with the fact that the tour operator just blew off the requirement to get a permit when traveling through the territory? What do we do with that? Yeah. I wouldn't call it blew off. They, I think the evidence was that they didn't know that there was such a requirement. So I wouldn't term it that way. But what we do. But there are tour operators. So wouldn't we assume that tour operators would know or make inquiry? They should. Maybe they should have done that. And what we do with that is we assume the existence of the consensual relationship. And that's what we do. We don't make a factual assumption about what would have been the intent had the contractual relationship been entered. This is a legal issue. Are you saying that we should assume that there was a consensual relationship between the tour operator and the Navajo Nation? Yes. Just like it's straight. Okay. And so then we are trying to determine what the parameters of that are. We're trying to determine whether there was a nexus between the accident that occurred here and the consensual relationship. But you're telling us to ignore the document that would govern that relationship if they had complied with the requirements in determining the nexus. No, I'm not saying ignore it. I'm saying that we don't talk about the meeting of the minds and what the parties intended because we don't have any evidence of that and we don't – it's not a factual issue. Well, doesn't that then reward the tour operator for failing to comply with the permit requirements? Not at all. Because regardless, I think that there's not the nexus that we need as in straight. But if they had signed the permit, we'd have to figure out whether they consented to jurisdiction. We wouldn't need to talk about the nexus because the consent provision in the contract may or may not consent to this accident. But if it does consent, nexus is out of here because they consented. So tell us why they didn't consent if we think that they – we should assume they would have signed this permit. Because you can look at the language of the permit, which says we consent to Navajo court jurisdiction over lands within the jurisdiction of the Navajos. And this is not in the jurisdiction of the Navajos. It's just not – there's not one case that has found adjudicatory jurisdiction over a non-Indian for a car accident that occurred on U.S. or federal state highway. There are cases in the Navajo courts that do. But this is an issue of federal law. And we're here – Well, you said there's not one case. I'm sorry. One case that applies here, case of federal law. I apologize for you. I would like to make one other point real quick. And that is defendants seem to – one of the faulty premises that underlies their argument is that because the Navajos have decided to regulate tourism, that gives them the adjudicatory authority over this accident. That is actually a backwards analysis. Precept is not that the Navajos, if they decide to regulate, thereby get the adjudicatory jurisdiction. It's that tribal adjudicative authority can't exceed its regulatory authority. And the question then is whether the regulatory authority applies to this highway, because they don't have the power to exclude. They don't have the regulatory authority. No regulatory authority. No adjudicative authority. And that just follows. Could we hold that they don't have adjudicative jurisdiction over this accident, but they do have regulatory authority over this highway? Not because they don't have the power to exclude. They can't have the regulatory authority. You have to have – they go hand-in-hand. If you go – Well, but couldn't regulatory authority be broader? I understood that adjudicatory authority could not be broader than regulatory, but the other way could be true, couldn't it? I'm not – I don't think the courts have decided that issue yet, but if you look at South Dakota v. Borland, it says that the two go hand-in-hand. The power to exclude goes hand-in-hand with the power to regulate. At least under our current law that we have now, the current cases, you have to have the power to exclude in order to have the power to regulate. And if you don't have the power to regulate, you certainly don't have the power to adjudicate. Do you dispute that they could regulate through this permit, though, a company like your clients, because they're going off the highway, could be regulated on the highway? They could be regulated off the highway. And I agree that that could be enforced in any number of ways. They could have somebody stationed. Whoever is taking the tickets at Monument Valley can see, you have a tour bus full of people. Let me see your permit before you go in. And that would be certainly one way of regulating and making sure that the tour companies follow their regulations. So the permit, could the permit say that the tour operator consents to jurisdiction of the Navajo court in all areas of the reservation, including the rights-of-way that go through the reservation? Could they agree to that? I suppose. I mean, I'm not sure that parties, through agreements, can confer or take away subject matter jurisdiction. It either exists or doesn't exist. But I recognize that under the consensual relation exception in Montana, I suppose a broader consent could be, we don't care if we're on highway, even though you don't have the power to exclude us. But that's certainly not this case. We'd ask you to affirm. Thank you, Your Honor. Roberts. Your Honor, first of all, there is no treaty argument made in straight. If you look at Montana and Borland, they both stand for the proposition that the tribe has the power to exclude and the power to regulate hunting and fishing in the absence of abrogation. In those cases, there was abrogation. The grant of this right-of-way does not constitute abrogation. Abrogation can only be effected by Congress. Second, with respect to where regulatory, therefore adjudicatory, the case of Waterwheel, decided by this Court, says that where there's valid regulatory, there's valid adjudicatory jurisdiction, unless it conflicts with some Supreme Court precedent or act of Congress. Next, straight says where the tribe has valid rights to regulate, the civil authority to regulate, it has civil jurisdiction to adjudicate disputes arising out of the matter regulated. So that if the tribe has the power to regulate commercial touring, it therefore has the power to regulate disputes arising from it. But opposing counsel said there's no nexus. There would be no nexus between the accident and the regulated activity. Thank you for that question. You're welcome. The nexus is this, Your Honor. The Congress passed an act funding construction of this roadway. It said that the purpose were to further purposes of existing treaties, to provide facilities and employment to combat disease, hunger, and poverty. Its purposes were to enhance diversified economic opportunity in a self-supporting economy, and to facilitate the fullest possible participation of Navajo Indians in the administration of their own affairs. By that, Congress defined what was the contours of tribal sovereignty with respect to this roadway. And the tribe, in response, fulfilled all of its Congress's purposes by enacting the Touring Guide Service Act, which provides for safety regulations, proof of insurance, proper licensing. When were the regulations requiring a permit passed? 1972. They were amended right after this collision occurred in 2005. But they also provided for economic development, where they charge a revenue, where they regulate. Before 2005, did they say that commercial tours needed a permit? Yes, before that and after that. The difference in 2005, just after this collision, was that the administration of the Act went from the Economic Development Department to Tours and Rec. But the Act also provides for economic development, where it raises revenue and regulates an important industry to the economic development plan of the nation. And lastly, the tribe, in fulfillment of Congress's purposes, that it fully participate in the administration of its own affairs, legislated to pass the Act. Through its executive branch, it provides needed first responder services, EMT, fire and rescue, police were all on the scene. Lastly, it developed a broad-based and effective court system, which is ready to adjudicate traffic accidents just of this type that occurred. It was a type of accident that the Navajo Nation anticipated would occur in its Touring Guide Service Act. It made provision to try to prevent those accidents. But you see, they anticipated it, and it still caused the resulting devastating harm to the Jensen and Johnson families. Thank you, Your Honor. Thank you to all counsel. The case just argued is submitted for decision by the Court.
judges: Marshall, Rawlinson, Friedland